UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SONYA COLEY, ET AL.,

                        Plaintiffs,

           - against -

VANNGUARD URBAN IMPROVEMENT
ASSOCIATION, INC., ET AL.,

                        Defendants.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

**MEMORANDUM & ORDER**
12-CV-5565 (PKC) (RER)

     Plaintiffs brought this action in 2012, alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). (Dkt. 1.) Plaintiffs now move for a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") to prevent the transfer or dissipation of the assets of the remaining non-defaulting Defendant, Arthur Niles ("Niles").[1] (Dkt. 160.) Plaintiffs additionally argue for a restraining of Defendants' assets under New York Civil Practice Law and Rules ("CPLR") § 5229, and an order of attachment under CPLR § 6201. (Dkt. 221.) The Court holds that it lacks the authority to issue a TRO or PI under *Grupo Mexicano de Sarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) ["*Grupo Mexicano*"] and its progeny. The Court does, however, order a restraint on any remaining assets of the defaulted Defendants pursuant to CPLR § 5229, and orders an attachment, pursuant to CPLR § 6201, of: (i) all of Niles's assets; (ii) all money transferred from any Defendant to Defendant Thomas Hansard, Jr. ("Hansard") after the filing of this lawsuit; (iii) all money transferred from any Defendant to C & L Boiler Corp. after the filing of this lawsuit; and (iv) all money transferred from any Defendant

---

[1] Although Plaintiffs do not refer to a specific provision, the Court assumes they are moving for the TRO and PI under Federal Rule of Civil Procedure ("FRCP") 65.

to Andre Soleil after the filing of this lawsuit. The Court attaches these assets pending proof from these persons and entities that the money was transferred to them for legitimate purposes or to pay for services rendered.

## BACKGROUND

Plaintiffs filed their third amended complaint ("TAC") on May 5, 2014, seeking damages for alleged willful violations of the FLSA and NYLL. (Dkt. 100 at 1–2.) Plaintiffs brought the action against their former employer Defendant Vannguard Urban Improvement Association, Inc. ("Vannguard"), as well as against various related parties, namely, Defendant Vannguard Local Development Corporation, Inc. ("Local"), Defendants 1686 Gates General Partners Corp., Malcolm 1677 General Partners Corp., 1659 Hancock General Partners Corp., and 1661 Macon General Partners Corp. (collectively, "the Partnership Corporations"), Defendant Hansard, the former chairman of the Vannguard Board of Directors ("Board"), and Defendant Niles, the former executive director and general manager of Vannguard. Plaintiffs seek damages, as well as a declaratory judgment and unspecified "injunctive relief." (Dkt. 100 at 31–32.) On August 5, 2016, the Court granted default judgment against Vannguard, Local, and the Partnership Corporations. (Dkt. 220.) Niles is the sole remaining non-defaulting Defendant.[2]

On February 8, 2016, Plaintiffs filed an *ex parte* motion for a TRO and PI, seeking to freeze the assets of Niles, his wife, all entities over which they exercise control, all other Defendants, Defendants' former counsel, Soleil, or "any other attorney who participated in the fraudulent conveyance of Vannguard's property," and "the assets held or invested by Omni Financial." (Plaintiffs' *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction at 2.) The motion also requested that the Court rescind the sales of all Vannguard property between 2013

---

[2] The Court dismissed Hansard as a defendant on September 24, 2014. (Dkt. 123.)

and the date of the motion, and require Defendants to post a bond sufficient to satisfy any judgment. *Id.* The Court denied Plaintiffs' *ex parte* request in a February 11, 2016 Order, but directed Plaintiffs to refile their motion on the record. (Dkt. 158.)

On February 11, 2016, Plaintiffs refiled their motion on the record. (Dkts. 159 & 160.) On May 3, 2016, the Court held a partial preliminary injunction hearing at which Niles testified at length in response to questions by Plaintiffs' counsel and the Court. The hearing was continued to permit Niles to provide additional testimony, this time in response to questioning by his attorney. The hearing was adjourned until June 1, 2016, but Niles failed to appear due to a medical emergency. The Court heard testimony from a third-party witness and received additional documentary evidence from Plaintiffs. The hearing was again adjourned until July 18, 2016, to allow Niles to testify further and for oral argument. Immediately following the June 1 hearing, the Court issued a docket order asking the parties to be prepared to address at the July 18 hearing the question of the Court's authority to issue the requested injunction in light of the Supreme Court's holding in *Grupo Mexicano* and its progeny, including the Second Circuit's holding in *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014).

The July 18 hearing was twice adjourned, first to July 20 at the request of Plaintiffs' attorney, and then to August 8, 2016 at the request of Niles's attorney. At the August 8 hearing, Niles rested on his prior testimony and the Court heard argument regarding Plaintiffs' motion for a TRO/PI to restrain assets. Both in their oral argument and written submissions following the July 18 hearing, Plaintiffs also moved to restrain assets pursuant to CPLR § 5229 and for an attachment of assets pursuant to CPLR § 6201. (Dkt. 221 at 3–6, Dkt. 222 at 2–7.)

**DISCUSSION**

**I.    TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**A.    Legal Standard**

"[T]he traditional standards which govern consideration of an application for a [TRO] . . . are the same . . . as those which govern a [PI]." *Local 1814, Int'l Longshoremen's Ass'n, AFL–CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir.1992). "A preliminary injunction is considered an 'extraordinary' remedy that should not be granted as a routine matter." *See Ahmad v. Long Island Univ.*, 18 F. Supp. 2d 245, 247 (E.D.N.Y. 1998) (quoting *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir.1990)). The decision to grant or deny it rests in the district court's "sound discretion." *Id.* To obtain a preliminary injunction, a moving party must show: (1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by the requested relief. *Salinger v. Colting*, 607 F.3d 68, 80–83 (2d Cir. 2010).

Before reaching the question of the Court's discretion, however, the Court must address the question of its authority to issue a preliminary injunction of the type requested here. Under *Grupo Mexicano*, federal courts lack the authority to grant pre-judgment injunctions to prevent the defendant "from transferring assets in which no lien or equitable interest is claimed." *See Grupo Mexicano*, 527 U.S. at 310. *Grupo Mexicano* explicitly distinguished its earlier decision in *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), on the grounds that in *Deckert*, which allowed a prejudgment asset freeze, the bill "stated a cause of action for . . . equitable remedies" that included "rescission of the contracts and restitution of the consideration paid." *Grupo Mexicano*, 527 U.S. at 325. The Court explained that the "preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill

seeking equitable assistance in the collection of a legal debt." *Id.* In contrast, the Court noted that "a preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally." *Id.* at 326–27.

Federal courts, therefore, "maintain the equitable power to [issue an asset freeze] . . . where the plaintiff is pursuing a claim for final equitable relief . . . and the preliminary injunction is ancillary to the final relief." *Gucci America*, 768 F.3d at 131. Based on this reasoning, most courts require a "nexus" between the injunctive relief requested and the equitable relief ultimately sought. *See, e.g.*, *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959, 2016 WL 6102370, at *6 (S.D.N.Y. Oct. 18, 2016) (discussing and applying this requirement). The question of whether a court may grant a preliminary injunction "turns on whether the injunction acts 'in aid of the recovery' sought in equity." *Id.* at 3; *see also United States ex rel. Rahman v. Oncology Assocs. P.C.*, 198 F.3d 489, 496–97 (4th Cir. 1999) ("[W]hen the plaintiff creditor asserts a cognizable claim to *specific* assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment . . . . This nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets.") (emphasis added); *Serio v. Black, Davis & Shue Agency, Inc.*, No. 05-CV-15, 2005 WL 3642217, at *6 (S.D.N.Y. Dec. 30, 2005) (explaining that to obtain a preliminary injunction, the movant must "satisfy the court that he is asserting an equitable claim . . . and that the injunctive relief that he is seeking is related to that claim, or, alternatively, that he should be deemed to have an equitable lien, or other interest enforceable in equity, on the assets that he is seeking to attach or otherwise freeze"); *Micnerski v. Sheahan*, 02-C-7025, 2002 WL 31415753, at *1 (N.D. Ill. Oct. 25, 2002) (instructing that "the relevant inquiry is not simply whether plaintiff

seeks *any* equitable relief, but whether there is a 'nexus' between the assets sought to be frozen . . . and the equitable relief requested in the lawsuit") (citing *Rahman*, 198 F.3d at 496–97); *Wishnatzki & Nathel, Inc. v. H.P. Island–Wide, Inc.*, 00-CV-8051, 2000 WL 1610790, at *1 (S.D.N.Y. October 27, 2000) ("[C]ourts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it[s] equitable power to freeze assets."); *F.T. Intern., Ltd. v. Mason,* CIV.A. 00–5004, 2000 WL 1514881, at *1 (E.D. Pa., Oct. 11, 2000) (explaining that a plaintiff may obtain a prejudgment asset freeze "only if he has asserted a cognizable equitable claim, has demonstrated a sufficient nexus between that claim and specific assets of the defendant which are the target of the injunctive relief, and has shown that the requested interim relief is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed*.*"); *Fairview Mach. & Tool Co. v. Oakbrook Int'l Inc.*, 77 F. Supp. 2d 199, 204 (D. Mass. 1999) (applying the *Rahman* factors and asking, first, whether "the claims in the suit seek cognizable relief in equity against specific assets of the defendant," and, second, whether "a preliminary injunction freezing these assets [would] be a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed") (internal quotation marks omitted)).

Thus, courts have found that they have the authority to issue PIs where plaintiffs have sought constructive trusts and have included a demand for an accounting, because a preliminary injunction involving those specific funds is "ancillary to the final relief" sought. *Gucci America*, 768 F.3d at 131–32. *See also CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir. 2002) (upholding preliminary injunction freezing defendant's assets and finding *Grupo Mexicano* inapplicable because plaintiff sought an accounting and constructive trust); *Adelphia Commc'ns Corp. v. Rigas*, 02-CIV-8495, 2003 WL 21297258, at *5 (S.D.N.Y. June 4, 2003) (same).

In contrast, when the injunctive relief requests freezing of assets more generally, rather than those connected to a particular property or fund that is the object of the ultimate equitable relief sought, courts have found that they lack the authority to issue injunctions "to effectuate the collection of money in satisfaction of . . . alleged legal liability." *JSC Foreign Econ. Ass'n. Technostroyexport v. Int'l Dev. & Trade Servs.*, *Inc.,* 295 F. Supp. 2d 366, 389 (S.D.N.Y. 2003); *see also Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 729–30 (9th Cir. 1999) (characterizing *Grupo Mexicano* as holding that "in the case of an unsecured creditor, a district court is without authority to issue a preliminary injunction that effects a 'freeze' on the debtor's assets"); *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 394 (E.D.N.Y. 2016) (finding that plaintiff's request for a preliminary injunction was "made primarily to protect the Defendants' assets in the event it succeeds on its breach of contract claims for monetary damages, a result that is plainly prohibited by *Grupo*"); *Klipsch Grp., Inc. v. Big Box Store Ltd.,* 12-CV-6283, 2012 WL 5265727, *7 (S.D.N.Y., Oct. 24, 2012) (holding that the plaintiff had not "presented any authority to persuade the Court to freeze assets in which Plaintiff claims no equitable interest simply because Plaintiff has included equitable claims in its complaint"); *Micnerski*, 2002 WL 31415753, at *1 (concluding that it did not have the power to grant a prejudgment asset freeze even though the complaint sought "injunctive relief to prevent further violations of law," restoration of job assignments, back pay, and front pay, because none of the specific equitable relief involved the assets that plaintiff requested to be frozen).

In other words, courts consistently refuse to allow preliminary injunctions when such injunctions essentially "seek[] security for a potential future award of money damages" and are requested merely because of a "feared inability to collect a prospective judgment." *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 971 (W.D. Mich. 2008); *see also Henderson v. Biltbest*

*Prods. Inc.*, 4:10-CV-01503, 2010 WL 5392828, at *7 (E.D. Mo. Dec. 22, 2010) (concluding that plaintiffs "failed to allege or show any applicable exceptions to the general rule that an unsecured creditor has no rights at law or in equity in the property of his debtor," and that "seek[ing] to invoke the Court's equitable powers to freeze assets to protect an anticipated money judgment . . . is precisely the type of 'race to the court house' . . . that the Supreme Court cautioned against in *Grupo*"); *Tang Capital Partners, LP v. Cell Therapeutics, Inc.*, 591 F. Supp. 2d 666, 671–72 (S.D.N.Y. 2008) (stating that *Grupo Mexicano* stands for the proposition that "a plaintiff who has sued for a completed breach of a contract cannot 'secure' the money judgment to which he may someday become entitled by 'holding up the money,' as it were, through an injunction against any transfer of defendant's assets").

Related to, but slightly different from, the "nexus" requirement, some courts have held that they do not have the authority to issue an injunction even when there is an equitable claim, unless the equitable claim is central, dominating, or the "heart" of the matter. *See, e.g.*, *Corp. Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am., Inc.*, 915 F. Supp. 2d 1059, 1062–64 (D. Minn. 2013) (concluding that "the better reading of *Grupo Mexicano* and *Deckert* focuses on the essence of the action and the strength of the alleged equitable interest" and concluding that "the instant action is fundamentally a contract dispute for money damages" and that the "principal objects" of the suit were money damages, even though there was an unjust enrichment claim); *Oak Leaf Outdoors, Inc. v. Double Dragon Int'l, Inc.*, 812 F.Supp.2d 944, 947–48 (C.D. Ill. 2011) (finding that the asserted "equitable claims" of promissory estoppel, unjust enrichment, and

"injunctive relief," "all derive[d] from the same occurrence, namely, a breach of contract" and thus finding that it lacked authority to issue the preliminary injunction).[3]

## B.     Application

Here, Plaintiffs seek an asset freeze to "prevent the transfer or dissipation (or further dissipation) of the defendants' assets." (Dkt. 160 at 1.)  Plaintiffs' motion requests a broad freeze of the assets of each Defendant, Niles's spouse, Soleil (Defendants' former counsel), and "any other attorney who participated in the fraudulent conveyance of Vannguard's property," the assets held or invested by Omni Financial,  the assets of third parties under the dominion and control of Niles, and the assets of "[any] financial or brokerage institution or other person or entity holding any funds or assets in the name, for the benefit or under the control of the defendants, or their subsidiaries, and which receives actual notice of this order . . . ." (Dkt. 160 at 2.)  As in the *ex parte* motion, the TRO Motion also requests the rescinding of all sales of Vannguard property between 2013 and the date of the order, and that Defendants post bond sufficient to satisfy any judgment.  (*Id.*)  In arguing that their loss absent a preliminary injunction would be irreparable,

---

[3] *Grupo Mexicano* expressly left open whether State law can expand the equitable powers of a federal court sitting in diversity.  *See Grupo Mexicano*, 527 U.S. at 318 n.3.  Here, federal jurisdiction is conferred by 28 U.S.C. § 1331, and the Court has pendent jurisdiction over the NYLL claim.  Even assuming that State law *can* expand the equitable powers of a federal court sitting in diversity and further, that State law applies to any State law claim in federal court, the result in this case would be the same, because New York law appears to impose even stricter standards for granting a preliminary injunction.  In *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 729 N.E.2d 683 (N.Y. 2000), the New York Court of Appeals denied a preliminary injunction because the plaintiffs' cause of action for injunctive relief to prevent the threatened dissipation of defendant's assets was "incidental to and purely for the purposes of enforcement of the primary relief sought …. a money judgment." *Id.* at 687.  The court explained that "[m]aking an exception on the basis that permanent equitable relief is sought in support of a suit essentially for money only would be too facile a way to avoid and undermine the settled proscription against preliminary injunctions merely to preserve a fund for eventual execution of judgment in suits for money damages." *Id.*  The court stated the "general rule," that the court will refuse an injunction "*if convinced that a money judgment is the true object of the action and that all else is incidental.*" *Id.* (quoting Siegel, N.Y. Prac. § 327, at 498 [3d ed.]).

Plaintiffs state that "[a]ny hope for payment of these wages depends upon the plaintiffs' ability to recover the defendants' assets that were sold by defendant . . . Niles and that have been secreted away to private accounts." (Dkt. 160 at 3.) They argue that Plaintiffs were "entitled to payment before any other creditors out of the assets of the corporation in excess of valid prior liens or encumbrances." (Dkt. 160 at 3–4.)

By their own admission, Plaintiffs are requesting a broad asset freeze "to effectuate the collection of money in satisfaction of . . . alleged legal liability." *JSC Foreign Econ. Ass'n. Technostroyexport*, 295 F. Supp. 2d at 389. Indeed, the "heart" of Plaintiff's complaint is unquestionably legal; it primarily seeks damages for Defendants' breaches of the FLSA and NYLL. Thus, Plaintiffs' asset freeze request is plainly "a creditor's bill seeking equitable assistance in the collection of a legal debt." *Grupo Mexicano*, 527 U.S. at 325.

However, Plaintiffs argue that they have alleged retaliation claims under the FLSA and NYLL that are equitable because the remedies available under the NYLL, *i.e.*, injunction, reinstatement or front pay, and back pay, are all equitable. (Dkt. 221 at 3 (citing *Scaduto v. Rest. Assocs. Indus., Inc.*, 180 A.D.2d 458 (N.Y. App. Div. 1992).)[4] The Court finds that these claims cannot support the issuance of a preliminary injunction for a number of reasons. First, Plaintiffs do not actually request an equitable remedy in relation to their retaliation claims. In the TAC, the remedy sought for their retaliation claims is "judgment . . . in favor of the plaintiffs and against the defendants in the amounts to be determined at trial for . . . retaliation, including but not limited to emotional distress and punitive damages." (Dkt. 100 at 32.) This is not equitable relief. Second,

---

[4] Plaintiffs do not argue that their request for declaratory judgment entitles them to an injunction, nor could they. Freezing financial assets would not preserve the status quo in aid of the "recovery" of a declaratory judgment. Neither do Plaintiffs make any further arguments about the unspecified "injunctive relief" requested in the TAC.

Plaintiffs fail to show a "nexus" between the sweeping asset freeze they seek and their retaliation claim, *Shamrock Power Sales, LLC*, 2016 WL 6102370, at *6, or that Plaintiffs assert a cognizable claim to "*specific* assets of the defendant or seeks a remedy involving those assets." *Rahman*, 198 F.3d at 496 (emphasis added). Even if the Court were to read the TAC extremely liberally and suppose that the "amounts" Plaintiffs are requesting under the retaliation claim are for front or back pay and that such pay would be equitable in this context, Plaintiffs are not requesting freezing of a particular account or amount of money that is specifically connected to the asserted amount owed to them.[5]

In the final analysis, Plaintiff's retaliation claim, which on its face seeks only damages, is at most a legal claim "clothed in equitable garb." *Corp. Comm'n of Mille Lacs Band of Ojibwe Indians*, 915 F. Supp. 2d at 1063.[6] Therefore, under *Grupo Mexicano* and its progeny, the Court

---

[5] Furthermore, remedies that are equitable in some contexts may not be considered equitable in others. *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002) (holding, in a suit filed by an ERISA insurer seeking to enforce a contractual provision requiring a beneficiary to turn over money acquired from a third-party tortfeasor, that the plaintiff's claim for restitution, often considered an equitable claim, was not "equitable relief" within the meaning of the ERISA provision at issue, because "[t]he basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred").

[6] It should be noted that even if the Court were to find that it had the authority to issue a PI, Plaintiffs would be unlikely to succeed in meeting the "irreparable harm" requirement. When a plaintiff seeks back pay, front pay, the value of lost benefits or earnings, and even reinstatement, he has not alleged an "injury that is not capable of being fully remedied by money damages." *Ahmad*, 18 F. Supp. 2d at 249 (quotation marks omitted); *see also Jerome v. Viviano Food Co., Inc.*, 489 F.2d 965, 966 (6th Cir. 1974) (per curiam) (holding that a Title VII plaintiff was not entitled to a preliminary injunction in part because an award of back wages could adequately compensate her); *Henderson*, 2010 WL 5392828, at *7 (finding that plaintiffs would not suffer irreparable harm absent an order requiring defendants to immediately pay out health insurance trust payments and all unpaid wages due because "they can be fully compensated through an award of money damages").

lacks the authority to issue a TRO or PI under FRCP 65.[7]

## II.    CPLR § 5229

Plaintiffs also request relief under CPLR § 5229.  FRCP 64(a) permits federal courts to grant certain provisional remedies in accordance with State law.[8]  District courts in the Second Circuit have treated CPLR § 5229 as providing one such remedy.  *See Leser v. U.S. Bank Nat'l Ass'n*, 09-CV-2362, 2013 WL 867151, at *1 (E.D.N.Y. March 7, 2013); *Sequa Capital Corp. v. Nave*, 921 F. Supp. 1072, 1076 (S.D.N.Y. 1996); *see also Shamrock Power Sales, LLC*, 2016 WL 6102370, at *8 (listing CPLR § 5229 as a "prejudgment remed[y] that may be available to Plaintiff" under FRCP 64(a)").  CPLR § 5229 provides that "[i]n any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining order had been served upon him after judgment."  CPLR § 5229.  *See Kaminsky v. Kahn*, 46 Misc. 2d 131, 131–32 (N.Y. Sup. Ct. 1965) (stating, after plaintiff was awarded an interlocutory judgment directing an accounting from defendant, that the court saw "no need to await the entry of a final judgment" before granting restraint under CPLR § 5229).

The Court has discretion regarding whether to grant relief under CPLR § 5229 and the manner and limitations of any relief granted.  *Sequa Capital Corp.*, 921 F. Supp. at 1076 (citing 6 Weinstein, Korn & Miller, New York Civil Practice ¶ 5229.04 (1995)).  "Courts may order an

---

[7] This denial extends to all aspects of Plaintiffs' TRO/PI motion, including the request to rescind the sales of all Vannguard property between 2013 and the date of the motion and to require Defendants to post a bond to ensure satisfaction of any judgment in this matter.

[8] "At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment", if a federal statute does not apply.  FRCP 64(a).

adverse party restrained until judgment is entered where there is a danger that he will dispose of his assets." *Id.* However, the moving party need not make a particular showing of the danger of dissipation of assets. *See Leser*, 2013 WL 867153, at *3; *Gallegos v. Elite Model Mgmt. Corp.*, 1 Misc. 3d 200, 207 (N.Y. Sup. Ct. 2003) (finding no requirement that the prevailing party "submit evidence that assets are definitively being disposed of or diverted as a prerequisite to obtaining injunctive relief").

Plaintiffs have obtained default judgments against the defaulting Defendants, but there has not been a final damages award entered against them. (Dkt. 220 (granting default judgments, but deferring damages inquest until resolution of liability determination as to Niles).) Therefore, the Court finds that CPLR § 5229 authorizes examination and restraint of the assets of Defendants against whom default judgment has been granted, *i.e.*, Vannguard, Local, and the Partnership Corporations. (Dkt. 220.)

Defendants Vannguard, Local, and the Partnership Corporations are hereby restrained, as of the date of this Order, from selling, transferring, assigning or interfering with any assets they directly own or in which they have an interest until a damages judgment is entered in this case; and (2) they are hereby ordered to appear for a deposition and produce documents concerning their finances on a date mutually agreeable to all parties and no later than within forty-five (45) days of entry of this Order.[9] *See Leser*, 2013 WL 867151, at *3.

---

[9] The Court recognizes that this Order may not have any practical effect if the corporations no longer exist or have assets. (Dkt. 153 at ECF 3.) (Vannguard's counsel, Soleil, filed a letter seeking to be relieved as counsel, advising the Court that "Vannguard is currently an empty entity with no directors, employees, properties, interests, etc," and that his "client cannot and will never ever return").

Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

## III.    CPLR § 6201

Plaintiffs have also requested an attachment pursuant to CPLR § 6201(3), another remedy available in federal court pursuant to FRCP 64(a). *Capital Ventures Int'l. v. Republic of Argentina*, 443 F.3d 214, 218–19 (2d Cir. 2006). CPLR § 6201(3) provides that attachment may be granted to a plaintiff who has demanded a money judgment, when the defendant, "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." CPLR § 6201(3). Attachment is "a drastic remedy," and is "strictly construed in favor of those against whom it may be employed." *Northeast United Corp. v. Lewis*, 137 A.D.3d 1387, 1388 (N.Y. App Div. 2016); *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1073 (S.D.N.Y. 1994) ("Attachment is a harsh remedy, and should not be lightly granted by the court."). To obtain an attachment under CPLR § 6201(3), a plaintiff must also meet the requirements of CPLR § 6212(a), demonstrating "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits . . . and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." *Capital Ventures Intern.*, 443 F.3d at 219 (quoting CPLR § 6212(a)).

It is undisputed that there is a cause of action here and that the amount demanded from Niles exceeds all counterclaims known to Plaintiffs—the only counterclaim in this action was asserted against Plaintiff Sonya Coley by Vannguard, which has since defaulted. Thus, the only elements that Plaintiffs must prove with respect to their attachment request are: (1) Niles's fraudulent intent, and (2) likelihood of success on the merits of the underlying claim against him.

### A.      Fraudulent Intent

Under CPLR § 6201(3), "it is incumbent upon [the plaintiff] to demonstrate that the defendant is acting with intent to defraud." *Colon v. Cole Bros. Circus, Inc.*, 04-CV-3606, 2007 WL 3014706, at *2 (E.D.N.Y. Oct. 12, 2007) (quoting *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 331–32 (2d Cir. 1983)). It is "well established in New York" that "the mere removal or other disposition of property by a debtor is not a sufficient ground for an attachment." *Dafeng Hengwei Textile Co., Ltd. v. Aceco Indus. & Commercial Corp.*, 54 F. Supp. 3d 287, 293–94 (E.D.N.Y. 2014) (quoting *Bank of Leumi Trust Co. of N.Y. v. Istim, Inc.,* 892 F. Supp. 478, 483 (S.D.N.Y. 1995)); *see also Computer Strategies v. Commodore Bus. Machs.*, 483 N.Y.S.2d 716, 721, 105 A.D.2d 167, 173 (N.Y. App. Div. 1984) (explaining the same requirement). "[I]ntent [to defraud] must be proved, and the facts relied upon to prove it must be fully set out in the moving affidavits." *Eaton Factors Co. v. Double Eagle Corp.*, 232 N.Y.S.2d 901, 903, 17 A.D.2d 135, 136 (N.Y. App. Div. 1962) (per curiam); *see also Colon*, 2007 WL 3014706, at *2 ("Fraud is not lightly inferred, and the moving papers must contain evidentiary facts—as opposed to conclusions—proving the fraud.") (quoting *Brastex Corp.*, 702 F.2d at 331–32)); *JSC Foreign Economic Ass'n Technostroyexport*, 306 F. Supp. 2d at 487 (stating that it is insufficient "to submit affidavits containing allegations that merely raise suspicions of fraudulent intent").

"The property removed or secreted must be the property of the defendant," and "allegations . . . of a disposal of corporate assets will not sustain the warrant of attachment." *Eaton Factors Co.*, 17 A.D.2d at 136. A plaintiff "must show the existence of a ground for attachment as to each defendant against whom he seeks a warrant." *Ford Motor Credit Co. v. Hickey Ford Sales, Inc.*, 465 N.E.2d 330, 334 (N.Y. 1984).

Although circumstantial evidence sufficient to raise the necessary inferences of fraud may be hard to come by, the Second Circuit has identified "badges of fraud," that include

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*CF 135 Flat LLC v. Triadou SPV N.A.*, 15-CV-5345, 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016) (quoting *In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983)).

Courts have found fraudulent intent based on circumstances such as a defendant's drawing a check with the knowledge that there were insufficient funds to satisfy payment, attempts to remove funds after the service of an *ex parte* order of attachment, furtive conduct such as refusing to respond to phone calls and mail inquiries, engaging in sales while a plaintiff's motion for a preliminary injunction was pending, and counsel's inability to explain where the proceeds from sales have gone. *Societe Generale Alsacienne De Banque, Zurich v. Flemingdon Dev. Corp.*, 500 N.Y.S.2d 278, 118 A.D.2d 769, 773 (N.Y. App. Div. 1986); *JSC Foreign Economic Ass'n Technostroyexport*, 306 F. Supp. 2d at 487–88.

Here, the Court concludes, based on Niles's testimony at the May 3, 2016 hearing,[10] Defendants' evasiveness throughout these proceedings, and documentary evidence Plaintiffs have submitted in connection with the May 3, 2016 hearing and their Motion to Amend/Correct/Supplement their 221 Letter, (Dkt. 222), that there is sufficient evidence of Niles's fraudulent intent to warrant an attachment of assets under CPLR § 6201(3).

---

[10] Based on Niles's demeanor and, as discussed below, his evasive and contradictory testimony during the hearing, the Court found him thoroughly not credible.

First, there is Niles's $300,000 "severance" payment. Niles's testimony—explaining why he withdrew a $300,000 "severance" payment in September 2014 from Vannguard's bank account nearly two years after this lawsuit was filed, and where he thereafter deposited the money—was contradictory and at times incoherent. (May 3, 2016 Hearing Transcript ["Hearing Tr."] at 46, 55–56.) Regarding the justification for this payment to himself, Niles first testified that he was owed severance pay for his years of service to the corporation and years of missed back pay. *Id.* at 46, 55–56. He alluded to a Vannguard Board resolution from 2011 or 2012 that stated that Niles was owed $250,000 in back pay. (*Id*. at 64–66.) The severance agreement itself stated that Niles had been owed $720,000 in back-pay, and the $300,000 payment was agreed upon as a settlement for the $720,000 owed. (*Id.* at 73–74.) During his testimony, Niles also justified multiple payments he made from Vannguard to his son's corporation,[11] eight months *after* he withdrew the $300,000 in "severance" pay, by stating that the payments were based on additional back-pay owed to him by the company. (*Id*. at 62–64.) Niles could not explain why he was owed additional back pay after taking his $300,000 "severance," which is particularly suspicious in light of his testimony that the severance was in *settlement* of the $720,000 claim. (*Id*. at 67–68) ("I decided that that's what was owed to me.")[12] Niles also could not account for where the $300,000 he withdrew for

---

[11] The address for Niles's son's corporation was 516 Macdonough Street, the same address where Niles lived and the address listed for Vannguard. (Hearing Tr. at 50, 95.) Niles's son lived in Oklahoma. (*Id.* at 94.)

[12] Niles took out significant amounts of money from the corporation on other occasions without any apparent justification. On December 13, 2013, he took out nine checks, all in the amount of $950, all made out to him and all cashed into his personal account. (Hearing Tr. at 85.) Niles explained that another company had put together a "grant" to Vannguard for a project and intended Niles to take out portions of the "grant" as income while he worked on the project, although he added that "yeah, I guess I should have waited over, you know, months at a time or whatever for my portion of it to be given to me, but --" (*Id*. at 88–89.) He admitted that he wrote nine separate checks to circumvent a company policy that "checks over a thousand dollars had to have … two signatures." (*Id*. at 90.)

his "severance" went. (*Id.* at 49–51, 54.) He originally testified that "a significant portion of it" went to his son's corporation, (*id.* at 50), but later acknowledged that, as noted, deposits to his son's corporation were made directly from Vannguard's account to his son's corporation eight months *after* Niles had withdrawn his severance pay. (*Id.* at 58–60.)

Second, there is the $1.9-million sale of Local property. On September 26, 2013, approximately three weeks after being served in this case, Niles, on behalf of Local, sold a property on Fulton Street in Brooklyn ("Fulton Street Property") for $1.9 million. (Dkts. 60; 222, Exhibit 1.)[13] Niles testified that at the time of the sale, the property had a mortgage of between $1.2 and $1.5 million, but he could not account for the remaining $400,000–700,000 that Local should have received as profit from the sale. (Hearing Tr. at 113–15.) He said he "believe[d]" the money would have been deposited into Local's account. (Hearing Tr. at 113–14.) However, Defendants never produced any bank records showing where the money went, and the bank records for Local fail to reflect any such deposit. (Hearing Tr. at 114.) Defendants have yet to account for the proceeds from the Fulton Street property sale.

Plaintiffs have pointed to compelling evidence that at least some of the proceeds of the property sale were transferred to close associates of Niles for little or no consideration in order to conceal the proceeds after the filing of this lawsuit. On February 4, 2013, Niles, on behalf of

---

[13] Although Local was not yet a Defendant in this action at the time of the sale, the interrelationship of the two entities, and Niles' apparent control of both, nevertheless make the transfer suspicious. Local's By-Laws refer to Vannguard as its "parent company" and indicate, in sum and substance, that Local was formed to provide financial support to Vannguard. (Vannguard Local By-Laws; Plaintiffs' Exhibit 30, 6/1/16 Hearing.). Niles was the Executive Director of both entities, and conveyed the property as Local's "President," after he and Vannguard had been sued in this action. (Hearing Tr. at 19–20; Dkt. 222, Exhibit 1.) The Court is thus not convinced by Soleil's assertion that at the time of the sale, because "Plaintiffs had not given any notice to [Local] of their claims" "[Local] had no reason to imagine that it may be an eventual party to the herein matter," and "could not have intended to 'hinder, delay, or defraud' the Plaintiffs." (Dkt. 166 at ECF 4, 6.)

Local, confessed a $475,000 judgment to C & L Boiler Corp., a recently incorporated entity run

by Ernestine Narcisse Mings, an attorney from Soleil's office.  (Dkt. 222, Exhibits 21, 22.)

Notably, the listed address for this purported boiler company is Soleil's office address.  (Dkt. 222,

Exhibits 21, 22.)[14]  The confession of judgment did not state facts about the debt allegedly owed

by Local to C & L, as required by CPLR § 3218(a)(2).  *Id.*  Although Niles averred in an Affidavit

for Judgment by Confession that he was authorized to confess the judgment to C & L Boiler Corp.

by a Vannguard Board resolution passed on August 10, 2012, C & L had not yet been re-

incorporated on that date.  (Dkt. 222, Exhibits 19, 21.)[15]  The judgment was marked "wholly paid"

on September 26, 2013, the day the Fulton Street Property was sold.  (Dkt. 222, Exhibits 1, 22, at

---

[14] According to publicly available records, C & L Boiler Corp. "is an entity registered at KINGS county with company number 4309587. C/O ANDRE RAMON SOLEIL located at the address 32 Court Street Suite 1107 Brooklyn, New York" (Soleil's law office), and was "incorporated on October 10, 2012. Current status of the company is active."  Company-detail.com, https://www.company-detail.com/company-c-amp-l-boiler-corp-4309587 (last viewed on 12/12/16).  It also appears that C & L was originally incorporated in 1987, but was declared inactive in 1992.  *See* Business Lookup, http://www.businesslookup.org/C_amp_L_BOILER_CORP.

A state court decision, *Strulovich v. C&L Boiler Corp.*, 2013 NY Slip Op. 31423(U) (N.Y. Sup. Ct. 2013), provides additional background regarding the history of C & L and Vannguard's relationship.  The case includes a factual finding that in October or November 2012, Soleil and representatives of Vannguard informed the State court plaintiff, who had purchased property from C & L that in fact belonged to Vannguard, that C & L and Vannguard "were interrelated entities with unity of ownership and that they would honor the contract." *Strulovich*, at *6.  As Plaintiffs in the present action have shown through an affidavit, and as discussed in *Strulovich*, Soleil incorporated C & L Corp. about one month after contacting the former owner of C & L, Audley Chambers, and threatening to sue him for adverse possession of real property Soleil claimed that Vannguard owned, unless Chambers sold the property at issue and used the proceeds to "pay off Vannguard's debts."  (Dkt. 222, Exhibit 20 "Chambers Affidavit".)  The facts in *Strulovich* and the Chambers Affidavit do not dispel, and may even reinforce, the inference that Soleil and Vannguard used C & L Boiler Corp. as a vehicle for dissipating and/or hiding their assets after the commencement of this litigation.

[15] To the extent it is possible that C & L Boiler Corp. provided services to Vannguard in connection with one of its properties, this discrepancy undercuts that conclusion.

19

ECF 6.)  Similarly, Mings filed a confession of judgment on behalf of former Vannguard board member and former Defendant Hansard for $20,000 on January 13, 2012.  (Dkt. 222, Exhibit 22, at ECF 13.)  Niles again provided an Affidavit for Judgment by Confession that did not contain facts about the purported debt owed by Vannguard to Hansard, contrary to CPLR § 3218(a)(2).  (Dkt. 222, Exhibit 22, at ECF 14–15.)  On February 1, 2013, Mings amended the judgment owed to Hansard to $116,394.52 (Dkt. 222, Exhibit 22 at ECF 7), which was also marked "wholly paid" on September 26, 2013.  (Dkt. 222, Exhibit 22 at ECF 12.)[16]  Finally, Soleil testified that he received $50,000 of the proceeds of the sale for "[his] legal retainer that [he] had not been paid for in many moons." (Dkt. 223-1, at 101.)

These transactions clearly exhibit numerous "badges of fraud." The confessions of judgment, containing no facts about how the alleged debts arose (in violation of CPLR § 3218(a)(2)), appear to be masks for transfers of Vannguard's money for no consideration to Hansard, Soleil, and C & L Boiler Corp., a corporation created, or at least revived, by Niles, Soleil, and/or Ming shortly before these transfers.  The "cumulative effect of [the] pattern or series of transactions" and "course of conduct" after the "pendency of … suits by creditors" as well as the "general chronology of the events and transactions under inquiry" strongly indicates fraudulent activity.  *CF 135 Flat LLC*, 2016 WL 5945912, at *10.

The Court finds the facts in this case analogous to those in *JSC Foreign Economic Ass'n Technostroyexport*, 306 F. Supp. 2d at 487–88.   In *JSC Foreign Economic Ass'n Technostoyexport*, the Court found evidence of fraudulent intent based on sales of property that closed after the filing of that action, "hazy" disbursement of the proceeds of the sales of those

---

[16] No bank records or other documents have been provided to the Court indicating where the funds came from to satisfy these confessions of judgment.

properties, and the inability of counsel to "explain where all the proceeds went and why." *Id.* at 487. Here, Niles withdrew $300,000 from Vannguard after the filing of this case, and has been unable to explain where the money has gone. Similarly, even assuming that Niles was correct that $1.2–1.5 million of the proceeds from the Fulton Street property sale were used to pay off the mortgage, the remaining $400,000–$700,000 of the proceeds are unaccounted for, and the approximately $661,000 that Plaintiffs were able to trace were distributed, under extremely dubious circumstances, to Niles and his associates after the filing of this lawsuit. Indeed, Niles's and the other Defendants' disbursement of the $300,000 "severance payment" and $1.9 million in property sale proceeds have certainly been "hazy at best." *Id.*

The Court finds this evidence more than sufficient to support a finding that Niles engaged in these transactions with actual intent to frustrate enforcement of a judgment that could result from this action. The Court therefore finds it appropriate to issue an order of attachment for (i) all of Niles's assets; (ii) all money transferred from any Defendant to Defendant Thomas Hansard, Jr. after the filing of this lawsuit; (iii) all money transferred from any Defendant to C & L Boiler Corp. after the filing of this lawsuit; and (iv) all money transferred from any Defendant to Andre Soleil after the filing of this lawsuit. The Court further finds that these funds constitute Defendants' property, *see Eaton Factors Co.*, 17 A.D.2d at 136, that was likely the subject of fraudulent transfers made after the initiation of this lawsuit in order to frustrate any judgment in this matter. The Court attaches these assets pending proof from these persons and entities that the money was transferred to them for legitimate purposes or to pay for services rendered.

**B.     Likelihood of Success on the Merits**

The Court also finds that there is a likelihood of success on the merits of the underlying claims against Niles. To establish probability of success on the merits under CPLR § 6212(a), a

plaintiff must show that it is more likely than not that it will succeed on the merits of its claim. *DLJ Mortgage Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009). In determining whether there is a likelihood of success on the merits for purposes of a CPLR § 6201(3) analysis, "all legitimate inferences should be drawn in favor of the party seeking the attachment." *JSC Foreign Economic Ass'n Technostoyexport*, 306 F. Supp. 2d at 485; *see also National Bank & Trust Co. of North Am., Ltd. v. J.L.M. Int'l, Inc.*, 421 F. Supp. 1269, 1271–72 (S.D.N.Y. 1976) (stating that in determining whether the plaintiff has met its burden of proving a prima facie case in support of the complaint upon which the attachment is based, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the stated facts").

As the Court previously found in its default judgment decision, (Dkt. 220), Plaintiffs are entitled to recover damages under the FLSA and NYLL against all of the defaulting Defendants. Based on the Court's prior findings, which are summarized below, and the additional finding, discussed below, that Plaintiffs likely could show that Niles qualifies as an employer for purposes of FLSA and NYLL liability, the Court finds that there is a likelihood of success with respect to Plaintiffs' claims against Niles.

### 1. FLSA Enterprise Liability

FLSA requires that an employer compensate employees, other than those falling into specific exemptions, for all hours worked, at a prevailing minimum wage, and provide overtime compensation for hours worked over 40 in a given workweek. 29 U.S.C. §§ 206, 207.

FLSA's requirements apply "pursuant to either 'individual' or 'enterprise' coverage," the former encompassing individuals "engaged directly in interstate commerce or in the production of goods for interstate commerce" and the latter, "substantially broaden[ing] the scope of [FLSA],"

encompassing "any employee of an enterprise engaged in interstate commerce." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 n.8 (1985); *see also Jacobs v. N.Y. Foundling Hosp.,* 577 F.3d 93, 96 (2d Cir. 2009) (FLSA's requirements apply "if an employee either: (1) is engaged in commerce or in the production of goods for commerce, or (2) is employed in an *enterprise* engaged in commerce or in the production of goods for commerce.") (quotation marks omitted) (emphasis in original)). Enterprise liability under FLSA extends to entities that: (1) perform related activities "for a common business purpose"; (2) have "employees engaged in commerce or in the production of goods for commerce, or . . . employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person"; and (3) have an "annual gross volume of sales made or business done [] not less than $500,000." 29 U.S.C. § 203(r)–(s).

Plaintiffs allege that Vannguard, a not-for-profit corporation, and its subsidiaries—Local and the Partnership Corporations—performed activities through contracts with New York City for the common business purposes of providing services to disadvantaged teens and young adults in Brooklyn, New York and engaging in community development projects, activities performed using "rent and other income received by [Vannguard's] subsidiaries." (Dkt. 100 ¶¶ 4, 6.) Plaintiffs allege further that Vannguard's employees "have handled and used and worked with goods that have been moved in or produced in interstate commerce, and that its annual gross volume of business was not less than $500,000 (exclusive of excise taxes at the retail level)." (*Id.* ¶ 5.) Defendants denied this allegation in their Answer without any elaboration. (Dkt. 70, 71 at ¶ 1.)

Enterprise coverage "has been interpreted broadly by the courts." *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 355 (E.D.N.Y. 2015). It is sufficient if Plaintiffs "handled supplies or equipment that originated out-of-state." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d

114, 121 (E.D.N.Y. 2011). For example, if even some employees use "radios, books, flashlights, clipboards, brooms, bags, and cleaning supplies that have moved in interstate commerce," that is sufficient. *Ethelberth*, 91 F. Supp. 3d at 355. In light of how "broad" the standard is for handling supplies that have originated out-of-state, it is certainly a "legitimate inference" that this prong is met. As to the requirement that Defendants' annual gross volume of sales made or business done is at least $500,000, as previously discussed, the single sale of the Fulton Street property resulted in a payment of $1.9 million to Local, which, as noted above, was formed to provide financial support to Vannguard. (Vannguard Local By-Laws; Plaintiffs' Exhibit 30, 6/1/16 Hearing.) It is therefore also a "legitimate inference" that the organization grossed at least $500,000 annually.[17]

2.    Defendants' Violations of the FLSA and NYLL

Plaintiffs allege that Niles and the other Defendants violated the FLSA and the NYLL by, *inter alia*, depriving Plaintiffs of straight time and overtime pay, which included forcing them to

---

[17] Additionally, on March 6, 2014, Niles, on behalf of Vannguard, sold four properties belonging to the Partnership Corporations (the "Partnership Properties") for about $9,600,000 to Dougert Legacy Managers LLC. (Dkt. 159, Exhibit 2, ECF 3-5.). This multimillion-dollar transaction also supports the inference that the Defendant entities grossed at least $500,000 annually.

The Court notes that Plaintiffs have pointed to the circumstances surrounding the transfer of the Partnership Properties as additional evidence of Defendants' fraudulent intent. As the Court discussed in its February 11, 2016 Order (Dkt. 158), the chronology of events surrounding the transfers (such as the fact that the properties were transferred from the Partnership Corporations to Vannguard in September 2014, six months *after* they were sold to Dougert), does not support an inference that Vannguard's assets were being dissipated. *Id.* at 4. However, the Court notes that other evidence involving the transfer, such as that the Partnership Corporations sold property to Vannguard four months after they were added to this action, that the September transfer involved virtually no consideration, and that Niles testified that he withdrew his $300,000 in "severance" from the proceeds of the sale, do lend support to the Court's conclusion regarding Niles's fraudulent intent. (Dkt. 100 at 1; Dkt. 159, Exhibit 2, at 8; Hearing Tr. 44–46.) However, the evidence before the Court is insufficient to allow it to include the entities that received the proceeds from the sale of the Partnership Properties in the attachment order.

work off the clock, misclassifying Plaintiffs as exempt from the minimum wages and overtime requirements of the FLSA (even though their tasks did not meet the criteria for those exemptions), and failing to make, keep, and preserve records of Plaintiffs' wages, hours, and conditions and practices of employment. (Dkt. 100 ¶¶ 157–163.) In both his answers to the complaint and his May 3 hearing testimony, Niles has essentially admitted these violations or, at least, admitted facts supporting legitimate inferences of FLSA and NYLL violations by Defendants.

Courts have "long interpreted [FLSA] to include a prompt payment requirement." *Rogers v. City of Troy*, 148 F.3d 52, 55 (2d Cir. 1998). The NYLL similarly requires that covered employees are paid "in accordance with the agreed terms of employment." *Belizaire v. RAV Investigative and Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 354 (S.D.N.Y. 2014) (citing NYLL § 191(1)(d)) (discussing these provisions of the FLSA and NYLL as similar); *see also* NYLL § 191(1)(a), (c) (also imposing this requirement).

Niles's own statements and admissions make clear that Defendants violated these provisions of the FLSA and NYLL. In his answer to the complaint, Niles admitted Plaintiffs' allegations that "[t]he defendants violated [NYLL] by delaying issuance of paychecks beyond the date payment was due," and "violated [NYLL] by making partial payments of wages earned under the plaintiffs['] appropriate salary rate." (Dkt. 68 at ¶ 150, 157; Dkt. 70 at ¶ 3.) Niles also admitted to "author[ing] letters on behalf of plaintiffs … informing [their creditors] … that defendant Vannguard had been unable to meet payroll obligations and these plaintiffs 'may be presently delinquent in their account with you…. through no fault of [their] own.'" (Dkt. 68 at ¶ 35; Dkt. 70 at ¶ 3.)[18] Niles admitted that for a 12-week period before August 7, 2012, Vannguard "had not

---

[18] Though Niles filed his Answer (Dkt. 70) while acting *pro se*, it appears to track almost identically with Vannguard's Answer. (Dkt. 71.) The admissions he listed are the same ones listed

25

paid the plaintiffs wages earned on their regular pay days", and that Plaintiffs complained directly to the Vannguard board, at an August 7, 2012 meeting, about the hardships Plaintiffs were suffering as a result of Vannguard's repeated failures to pay them during this 12-week period. (Dkt. 68 at ¶¶ 37, 42; Dkt. 70 at ¶ 3.)  With respect to these events, Niles also testified that Soleil informed the Vannguard staff that they would receive a check by August 10, 2012, but that Vannguard failed to pay them.  (Dkt. 68 at ¶¶ 38, 39, 41, 42, 43; Dkt. 70 at ¶ 3.)

Niles also admitted multiple times to Vannguard employees routinely being paid late.  In testifying about the $300,000 "severance payment" he withdrew from the Vannguard account, Niles attempted to justify it by claiming that Vannguard owed him $720,000 in back pay and that "[t]here were all these deficits that Vannguard was trying to catch up on and payroll."  (Hearing Tr. at 46, 74.)  He also stated, "we often … missed payroll, and that seemed to have been almost characteristic of the nature of the business that Vannguard was in," although he argued that the staff was paid prior to Niles receiving his severance package.  (*Id.* at 48.)

Thus, the evidence presented at the May 3 hearing and in connection with Plaintiff's motions clearly show that Vannguard violated both the FLSA and NYLL by chronically failing to pay Plaintiffs timely and in full.

### 3.    Niles's Asserted Defenses Are Insufficient

#### a)    FLSA Exempted Employee Defense

Niles has asserted as an affirmative defense to Plaintiffs' FLSA claims that Plaintiffs were hired as executive, administrative, or professional employees, and were thus exempt from the FLSA's overtime requirements pursuant to 29 U.S.C. § 213(a)(1).  (Dkt. 70 at ¶¶ 6, 7.)  These

---

by Vannguard, which was represented at the time by Soleil.  (Dkts. 70 & 71.)  In any event, given that Vannguard admitted these facts, there is ample basis to infer that they are true.

exemptions, known as the "white collar exemptions," are "narrowly construed" against the employer. *See Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 173 (E.D.N.Y. 2005) ("Because the FLSA is a remedial statute, its exemptions must be narrowly construed, and an employer bears the burden of proving that its employees fall within one of those exemptions."). Similarly, NYLL exempts "executive, administrative, or professional" employees from its minimum wage and overtime requirements. *See* NYLL § 651(5)(c); *Reiseck v. Univ. Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010) (explaining that "[t]he NYLL, too, mandates overtime pay and applies the same exemptions as the FLSA") (citing N.Y. Comp. Codes R. & Regs., tit. 12, § 142-3.2); *Scott v. SSP America, Inc.*, 09-CV-4399, 2011 WL 1204406, at *6 n.7 (E.D.N.Y. 2011) ("Because New York's overtime provisions mirror and/or expressly adopt federal wage law . . . federal courts evaluate New York's executive exemption by reference to" the FLSA and its regulations.) (citing N.Y. Comp.Codes R. & Regs. tit. 12, § 142–2.2).

Niles's own Answer, however, largely defeats this affirmative defense. Niles admitted that Plaintiff Ebony Hall "did not meet the executive, administrative or professional exemptions … that would permit wage payments on a salary basis," although he asserted that she earned a salary for at least some period of her employment. (Dkt. 68 at ¶¶ 76, 78, Dkt. 70 at ¶ 3.) He also admitted that four of the eight Plaintiffs—Mossa Jones, Salika Taylor, Elizabeth Wright, and Thomas Pope—"did not meet the executive, administrative or professional exemptions … that would permit wage payments on a salary basis," although he denied allegations that they were paid on a salary basis. (Dkt. 68 at ¶¶ 91, 115, 124, 135; Dkt. 70 at ¶ 3.)[19]

---

[19] Plaintiffs Coley and Sonya Johnson did not allege that they were not exempted employees. (Dkt. 68 at ¶¶ 70-72; 82-86.) They only alleged that they were owed vacation pay. *Id.* at 72; 86. Plaintiff Ruth Richardson alleged that she is not an exempted employee, which Niles has denied. (Dkt. 68 at ¶ 104; Dkt. 70 at ¶ 1.)

Thus, given that Niles's affirmative defense will likely fail as to the majority of Plaintiffs, this affirmative defense does not diminish the likelihood that Plaintiffs will succeed on almost all of their FLSA or NYLL claims.

b) *De Minimis* Violation Defense

Niles has also asserted as a defense that any FLSA violations were "*de minimis*." (Dkt. 70 at ¶ 8.) However, he has not demonstrated how this defense, which applies when "the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours," *Singh v. City of New York*, 524 F.3d 361, 370 (2d Cir. 2008), applies to Plaintiffs' allegations that they were misclassified as salary employees, and not paid for *hundreds* of hours of work. Thus, this defense does not undermine the likelihood that Plaintiffs will succeed on the merits with respect to their FLSA claims, nor does it affect their NYLL claims.

In sum, based on this evidence and these admissions, the Court finds that there clearly is a likelihood of success on the merits with respect to Plaintiffs' FLSA and NYLL claims against *Vannguard*. The next question, then, is whether Plaintiffs could show that Niles qualifies as an employer under the FLSA and NYLL such that he could be held liable for those violations.

4. Plaintiffs Are Likely to Show that Niles Qualifies as an Employer Under the FLSA and NYLL

Liability under the FLSA extends only to "employers," defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee". 29 U.S.C. § 203(d). "Employ" means to "suffer or permit to work". *Id.* § 203(g). These definitions "sweep broadly" in "identifying the persons or entities who qualify as 'employers' subject to [the FLSA]," *see Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 140 (2d Cir. 2008), and have a "striking breadth" meant to "cover some parties who might not qualify . . . under a strict application of traditional agency law principles," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

"The Second Circuit has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the circumstances." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) (internal quotations omitted). The Second Circuit asks whether there is "evidence showing [the potential employer's] authority over management, supervision, and oversight", as well as "factors that reflect [the potential employer's] direct control over the plaintiff employees". *Id.* at 111. It also looks to the factors from *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984) (the "*Carter* factors"), which are "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry*, 722 F.3d at 111 (quoting *Carter*, 735 F.2d at 12).

Similar to the FLSA, New York Labor Law defines "employer" as including "any person . . . employing any individual in any occupation." NYLL § 190(3). The definition of "employed" is that a person is "permitted or suffered to work." NYLL § 2(7). "Courts have interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA." *Perez v. Merrick Deli & Grocery, Inc.*, 13-CV-5166, 2015 WL 4104790, at *2 (E.D.N.Y. 2015).

At the May 3 hearing, Niles admitted that, during the time frame at issue in this case, he served as executive director for both Vannguard and Local and that he held the position of general manager for Vannguard. (Hearing Tr. at 19–20.) He testified that between the Vannguard-related entities, he had worked for the organization for 36 years. (Hearing Tr. at 20.) He testified that at Vannguard, he had employees under him and was responsible for the day-to-day direction of the workforce, and that as executive director, he was authorized to sign checks on behalf of Vannguard and Local. (Hearing Tr. at 20–21.) Similarly, in Niles's answer to Plaintiffs' Second Amended Complaint, he admitted Plaintiffs' allegation that "[a]s Executive Director and General Manager,

defendant Niles possessed the power to control the plaintiffs[, and] was authorized to hire, fire, discipline, assign employees, set work schedules, determine the rate and method of wage payments, establish classification of employees and maintain employment records." (Dkt. 68 at ¶ 10; Dkt. 70 at ¶ 3.) It is therefore abundantly clear that Niles meets all of *Carter* factors and that Plaintiffs, therefore, are likely to demonstrate that he qualifies as an employer under the FLSA and NYLL, such that he may be held liable for the FLSA and NYLL violations alleged in this case.

5. Statute of Limitations

Finally, Plaintiffs face no obstacle to obtaining relief based on the FLSA or NYLL's statute of limitations periods. The FLSA provides for a two-year statute of limitations period, which may be extended to three years upon a showing that the FLSA violations were willful. 29 U.S.C. § 255(a). The NYLL has a six-year statute of limitations period. NYLL § 663(3).

The Court finds that there is sufficient evidence that Defendants' FLSA violations were willful. As noted, Niles has admitted that during an August 7, 2012 meeting, Plaintiffs informed Vannguard board members about the organization's repeated failures to pay them their wages and the resulting hardships to Plaintiffs, and that Soleil informed the Vannguard staff that they would receive a check by August 10, 2012, which did not, in fact, come to pass. (Dkt. 68 at ¶¶ 38, 39, 41, 42, 43; Dkt. 70 at ¶ 3.) This evidence, combined with Niles's testimony about Vannguard "often" missing payroll, (Hearing Tr. at 48), gives rise to a legitimate inference that Defendants' violations were willful.

Accordingly, drawing all inferences in favor of Plaintiffs, it is clear that they have a likelihood of success on the merits against Defendant Niles, as well as the other Defendants, with respect to their FLSA and NYLL claims.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a TRO and PI is DENIED.  However, the Court orders the remaining assets of the Vannguard Entities RESTRAINED pursuant to CPLR § 5229.  The Court further orders attachment pursuant to CPLR § 6201(3) of: (i) all of Niles's assets; (ii) all money transferred from any Defendant to Thomas Hansard, Jr. after the filing of this lawsuit; (iii) all money transferred from any Defendant to C & L Boiler Corp. after the filing of this lawsuit; and (iv) all money transferred from any Defendant to Andre Soleil after the filing of this lawsuit.   The Court attaches these assets pending proof from these persons and entities, which shall be submitted within forty-five (45) days, that the money was transferred to them for legitimate purposes or to pay for services rendered.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 13, 2016
         Brooklyn, New York